IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

STATE OF ARIZONA,
*Appellee,*

*v.*

FRANCISCO L. ENCINAS VALENZUELA,
*Appellant.*

No. CR-15-0222-PR
Filed April 26, 2016

Appeal from the Superior Court in Cochise County
The Honorable Karl D. Elledge, Judge
No. CR-201300076
**AFFIRMED**

Opinion of the Court of Appeals, Division Two
237 Ariz. 307, 350 P.3d 811 (App. 2015)
**VACATED**

COUNSEL:

Mark Brnovich, Arizona Attorney General, John R. Lopez IV, Solicitor General, Joseph T. Maziarz, Chief Counsel, Criminal Appeals Section, Diane Leigh Hunt (argued), Assistant Attorney General, Tucson, Attorneys for State of Arizona

Mark F. Willimann (argued), The Law Office of Mark F. Willimann, LLC, Tucson, Attorney for Francisco L. Encinas Valenzuela

Bruce Washburn, Scottsdale City Attorney, Ken Flint, Assistant City Prosecutor, Scottsdale, Attorneys for Amicus Curiae City of Scottsdale

Jeffrey D. Bartolino (argued), Law Offices of Jeffrey D. Bartolino, Tucson; and David J. Euchner, Pima County Public Defender's Office, Tucson, Attorneys for Amicus Curiae Arizona Attorneys for Criminal Justice

Dean Brault, Pima County Legal Defender, Scott A. Martin, Assistant Legal Defender, Tucson, Attorneys for Amicus Curiae Pima County Legal Defender's Office

Michelle L. Behan, Nesci & St. Louis, P.L.L.C., Tucson, Attorneys for Amicus Curiae National College for DUI Defense, Inc.

———————

JUSTICE TIMMER authored the opinion of the Court, in which VICE CHIEF JUSTICE PELANDER and JUSTICES BRUTINEL and BERCH (RETIRED) joined, and CHIEF JUSTICE BALES concurred in part and dissented in part.

JUSTICE TIMMER, opinion of the Court:

**¶1**     Although the Fourth Amendment generally prohibits warrantless searches, they are permitted if there is free and voluntary consent to search. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973); *State v. Butler*, 232 Ariz. 84, 87 ¶ 13, 302 P.3d 609, 612 (2013). Consent cannot be deemed to be given "freely and voluntarily" if the subject of a search merely acquiesces to a claim of lawful authority. *Bumper v. North Carolina*, 391 U.S. 543, 548–49 (1968).

**¶2**     Arizona's implied consent law provides that "[a] person who operates a motor vehicle in this state gives consent . . . to a test or tests of the person's blood, breath, urine or other bodily substance" if the person is arrested for driving under the influence of alcohol or drugs ("DUI"). A.R.S. § 28-1321(A). Nevertheless, "the statute generally does not authorize law enforcement officers to administer the test without a warrant unless the [operator] expressly agrees to the test." *Carrillo v. Houser*, 224 Ariz. 463, 463 ¶ 1, 232 P.3d 1245, 1245 (2010). The issue here is whether, for Fourth Amendment purposes, a driver arrested for DUI voluntarily consented to give samples of his blood and breath after a police officer advised him that "Arizona law requires you to submit" to breath, blood or other bodily substance tests chosen by law enforcement. We hold that showing only that consent was given in response to this admonition fails to prove that an arrestee's consent was freely and voluntarily given. Because the admonition in this case was given in good faith reliance on precedent, however, exclusion of the test results is neither appropriate nor required.

## I. BACKGROUND

**¶3** In reviewing the denial of a defendant's motion to suppress, we consider only "evidence presented at the suppression hearing and view the facts in the light most favorable to sustaining the trial court's ruling." *State v. Hausner*, 230 Ariz. 60, 70 ¶ 23, 280 P.3d 604, 614 (2012).

**¶4** In August 2012, a Department of Public Safety ("DPS") officer found Francisco Valenzuela asleep in the driver's seat of his stopped truck with the engine running and the vehicle in gear. After spotting an open container of alcohol, detecting a strong odor of alcohol, and observing signs that Valenzuela was impaired, the officer arrested Valenzuela on suspicion of DUI.

**¶5** After taking Valenzuela to a police station, the officer read Valenzuela an "admin per se" form, which provided, in part, that "Arizona law requires you to submit to and successfully complete tests of breath, blood or other bodily substance as chosen by a law enforcement officer to determine alcohol concentration or drug content." The officer stressed this "requirement" three additional times and warned that refusal would result in a one-year suspension of Valenzuela's driver's license. (Although the officer read from part of the form while testifying at the suppression hearing, the form itself is not in the record.) Valenzuela cooperated and, in response to the officer's questions, stated he understood the admonition and had no questions. He then submitted to breath and blood tests. After the tests revealed that Valenzuela had an alcohol concentration ("AC") in excess of 0.20, the State charged him with five counts of aggravated DUI.

**¶6** Valenzuela moved to suppress the test results. He argued that he did not voluntarily consent to the tests, and the warrantless search therefore violated his Fourth Amendment rights. After conducting a suppression hearing at which only the DPS officer testified, the trial court denied the motion, reasoning that the totality of the circumstances showed that Valenzuela had voluntarily consented to the search. Based on the parties' stipulated facts, the court subsequently dismissed three counts, convicted Valenzuela on the remaining counts, and imposed prison sentences.

¶7        In a divided decision, the court of appeals affirmed. *State v. Valenzuela*, 237 Ariz. 307, 316 ¶ 35, 350 P.3d 811, 820 (App. 2015). The majority examined the totality of the circumstances and concluded that the trial court did not err in finding Valenzuela's consent voluntary. *Id.* at 315 ¶ 31, 350 P.3d at 819. The dissenting judge recognized the need to generally examine the totality of the circumstances to determine the voluntariness of consent. *Id.* at 317 ¶ 39, 350 P.3d at 821 (Eckerstrom, C.J., dissenting). Relying on *Bumper*, he nevertheless reasoned that when the evidence shows that police asserted lawful authority to search, "a court's analysis has reached its end; voluntary consent cannot be found as a matter of law." *Id.* Because, in his view, the admonition asserts a claim of lawful authority, the dissenting judge concluded as a matter of law that Valenzuela could not have voluntarily consented to testing. *Id.* at 318 ¶ 45, 350 P.3d at 822.

¶8        We granted Valenzuela's petition for review because it presents a recurring legal question of statewide importance. We have jurisdiction pursuant to article 6, section 5, of the Arizona Constitution and A.R.S. § 12-120.24.

## II. DISCUSSION

¶9        We review the denial of a motion to suppress evidence for abuse of discretion, considering the facts in the light most favorable to sustaining the ruling. *State v. Wilson*, 237 Ariz. 296, 298 ¶ 7, 350 P.3d 800, 802 (2015). "An error of law committed in reaching a discretionary conclusion may, however, constitute an abuse of discretion." *Busso-Estopellan v. Mroz*, 238 Ariz. 553, 554 ¶ 5, 364 P.3d 472, 473 (2015) (citation omitted).

### A.    Fourth Amendment principles

¶10        The Fourth Amendment to the United States Constitution protects individuals against "unreasonable searches and seizures," and any evidence collected in violation of this provision is generally inadmissible in a subsequent criminal trial. *Mapp v. Ohio*, 367 U.S. 643, 654 (1961) (internal quotation marks and citation omitted). A compelled blood draw or breath test administered pursuant to § 28-1321 is a search subject to the Fourth Amendment's restrictions. *See Butler*, 232 Ariz. at 87 ¶ 10, 302 P.3d at 612 (citing *Missouri v. McNeely*, 133 S. Ct. 1552, 1556 (2013)). A warrantless search is per se unreasonable under the Fourth Amendment unless one of

a few well-established exceptions applies. *Arizona v. Gant*, 556 U.S. 332, 338 (2009).

**¶11** One exception to the warrant requirement is a search conducted with consent. *See Schneckloth*, 412 U.S. at 219. When the state relies on consent to justify a warrantless search, as it does here, it "has the burden of proving that the consent was, in fact, freely and voluntarily given." *Id.* at 222 (citation omitted). Whether consent is voluntary or "the product of duress or coercion, express or implied," is a factual issue resolved by reviewing the totality of circumstances, including any "subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents." *Id.* at 227, 229; *see also Butler*, 232 Ariz. at 87 ¶ 13, 88 ¶ 19, 302 P.3d at 612, 613. The state must prove voluntary consent by a preponderance of the evidence.[1] Ariz. R. Crim. P. 16.2(b).

### B. Application of admonishment given pursuant to § 28-1321, Arizona's implied consent law

**¶12** Valenzuela argues that, under *Bumper*, his consent to providing blood and breath samples must be deemed involuntary because he consented only after the officer advised that Arizona law required him to submit to testing. The State responds, and the court of appeals majority agreed, that *Bumper* is distinguishable, and the totality of the circumstances evidences Valenzuela's voluntary consent to the search. *Valenzuela*, 237 Ariz. at 311 ¶¶ 12–13, 315 ¶ 31, 350 P.3d at 815, 819.

**¶13** In *Bumper*, law enforcement officers went to a home where a suspect lived with his grandmother. 391 U.S. at 546. After the grandmother opened the door, an officer announced he had a warrant to search her home, she said, "Go ahead," and the search unearthed evidence against the grandson. *Id.* In a subsequent suppression hearing in the grandson's criminal case, the prosecutor did not produce a warrant but relied solely on the grandmother's consent to justify the lawfulness of the search. *Id.* The

---

[1] In *State v. Cañez*, this Court mistakenly stated that the state must prove voluntary consent "by clear and positive evidence in unequivocal words or conduct expressing consent." 202 Ariz. 133, 151 ¶ 53, 42 P.3d 564, 582 (2002) (quoting *State v. Kananen*, 97 Ariz. 233, 235, 399 P.2d 426, 427 (1965)). After *Kananen* was decided, however, this Court promulgated Rule 16.2(b), which replaced the clear-and-positive-evidence standard.

grandmother testified that "[the officer] said he was the law and had a search warrant to search the house, why I thought he could go ahead. I believed he had a search warrant. I took him at his word." *Id.* at 547. After quoting this testimony, the Court relied on a line of older cases to hold that the prosecution failed in its burden to show that the grandmother freely and voluntarily consented because the record demonstrated only her "acquiescence to a claim of lawful authority." *Id*. at 548–49, 549 n.13 (citing *Johnson v. United States*, 333 U.S. 10, 13 (1948); *Amos v. United States*, 255 U.S. 313, 317 (1921)). It reasoned that "[w]hen a law enforcement officer claims authority to search a home under a warrant, he announces in effect that the occupant has no right to resist the search. The situation is instinct with coercion—albeit colorably lawful coercion. Where there is coercion there cannot be consent." *Id*. at 550; *see also Florida v. Bostick*, 501 U.S. 429, 435 (1991) (noting that the Fourth Amendment is not implicated when police request and obtain consent to search "as long as the police do not convey a message that compliance with their requests is required").

¶14 Valenzuela, the court of appeals dissent, and our dissenting colleague read *Bumper* as holding that consent is necessarily involuntary whenever police have asserted lawful authority to search, regardless of other circumstances. *See Valenzuela*, 237 Ariz. at 317 ¶ 39, 350 P.3d at 821 (Eckerstrom, C.J., dissenting); *infra* ¶ 41. Although *Bumper* did not directly address whether other circumstances should be examined or a per se rule applied in deciding whether a consent was freely given or in acquiescence to an assertion of lawful authority, it arguably rejected the former approach by not crediting the grandmother's additional testimony that "I let them search, and it was all my own free will. Nobody forced me at all." *See Bumper*, 391 U.S. at 556 (Black, J., dissenting); *see also Schneckloth*, 412 U.S. at 234 (noting that *Bumper* did not focus on the grandmother's subjective mindset). But another explanation is that the Court simply examined the circumstances surrounding the consent objectively, as it has done in subsequently decided Fourth Amendment decisions, *see Florida v. Jimeno*, 500 U.S. 248, 252 (1991) (scope of consensual search); *Illinois v. Rodriguez*, 497 U.S. 177, 186 (1990) (third party consent); *United States v. Mendenhall*, 446 U.S. 544, 554–55 (1980) (seizure), and concluded that the grandmother acquiesced to an assertion of lawful authority even though she had no objection to the officers executing on the warrant.

¶15 *Schneckloth* indicates that *Bumper* did not establish a per se rule. The issue in *Schneckloth* concerned what the prosecution must show

to demonstrate that a consent to search was given voluntarily. 412 U.S. at 223. The Court held that "whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Id.* at 227. Referring to its prior decisions to demonstrate the need for a "careful sifting of the unique facts and circumstances of each case," the Court stated that "*if under all the circumstances* it has appeared that the consent was not given voluntarily—that it was coerced by threats or force, or *granted only in submission to a claim of lawful authority*—then we have found the consent invalid and the search unreasonable." *Id.* at 233 (emphasis added). Significantly, the Court cited *Bumper, Johnson*, and *Amos* for this principle, removing any doubt that it intended that courts make the totality-of-circumstances inquiry in cases involving an assertion of lawful authority to search. *See id.* Indeed, Justice Marshall acknowledged this intent in his dissent by criticizing the majority for including *Bumper*-like scenarios within the totality-of-circumstances inquiry. *See id.* at 283 (Marshall, J., dissenting) ("We did not [in *Bumper*] inquire into all the circumstances, but focused on a single fact, the claim of authority, even though the grandmother testified that no threats were made. . . . It may be that, on the facts of that case, her consent was under all the circumstances involuntary, but it is plain that we did not apply the test adopted by the Court today.").

¶16        The *Schneckloth* Court's discussion of *Johnson*, which *Bumper* relied on, further supports our view. In *Johnson*, federal narcotics agents smelled burning opium outside a hotel room and gained entry after one agent knocked on the door, identified himself as a lieutenant, and then stated, "I want to talk to you a little bit." 333 U.S. at 12. The defendant opened the door, "stepped back acquiescently and admitted [the agents]." *Id.* The Court held that a subsequent search of the room violated the Fourth Amendment because "[e]ntry to defendant's living quarters . . . was demanded under color of office. It was granted in submission to authority rather than as an understanding and intentional waiver of a constitutional right." *Id.* at 13. In *Schneckloth*, after characterizing *Johnson*'s use of the term "waiver" as a synonym for "consent search," the Court stated that the *Johnson* Court "arrived at the conclusion that there had been no 'waiver' *from an analysis of the totality of the objective circumstances*—not from the absence of any express indication of Johnson's knowledge of a right to refuse or the lack of explicit warnings." 412 U.S. at 243 n.31 (emphasis added).

¶17 Our dissenting colleague suggests that we are misreading *Schneckloth* as displacing the Court's holdings in *Bumper*, *Johnson*, and *Amos*. *See infra* ¶ 39. That is incorrect. We merely reject the notion that whenever a law enforcement officer has asserted a claim of lawful authority to search, "a court's analysis has reached its end" and consent must be deemed involuntary as a matter of law. *See Valenzuela*, 237 Ariz. at 317 ¶ 39, 350 P.3d at 821 (Eckerstrom, C.J., dissenting). The *Bumper* line of cases survives to invalidate any consent given only in acquiescence to an assertion of a lawful authority to search. *See, e.g.*, *Florida v. Royer*, 460 U.S. 491, 497 (1983) (plurality opinion) (citing *Schneckloth* and *Bumper* to note that the burden to prove consent is not satisfied by showing a mere submission to a claim of lawful authority); *Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319, 329 (1979) (relying on *Bumper* to hold that "'consent' given in the face of 'colorably lawful coercion'" was invalid). We read *Schneckloth* and *Bumper* harmoniously as requiring a court to examine the circumstances surrounding an assertion of lawful authority to search to determine whether the consent was sufficiently independent of the assertion to remove its taint. If not, the consent was not freely and voluntarily given.

¶18 Although it might be difficult to prove that consent given after an assertion of lawful authority to search was nevertheless freely given, we should not preclude the possibility that it could happen. For example, consent conceivably could be voluntary if, after an officer asserts lawful authority to search, the officer retracts that assertion or an attorney advises that the search is not lawfully required before the subject of the search consents. *See Kunzler v. Pima Cty. Superior Court*, 154 Ariz. 568, 570, 744 P.2d 669, 671 (1987) (holding that a person arrested for DUI has the right to consult an attorney before taking a breath test when such consultation would not delay or interfere with the investigation or test taking); *State v. Brooks*, 838 N.W.2d 563, 571 (Minn. 2013) ("The fact that [defendant] consulted with counsel before agreeing to take each [AC] test reinforces the conclusion that his consent was not illegally coerced" as "an attorney functions as an objective advisor who could explain the alternative choices to the driver") (internal quotation marks and citation omitted). In such cases, a court might find that any subsequently granted consent was not compelled by the original assertion of authority.

¶19 Our dissenting colleague's position is not far removed from ours. He rejects an examination of other circumstances only when consent to a search "is immediately preceded by an assertion of lawful authority."

*See infra* ¶ 47. It is unlikely, but not impossible, that the state could meet its burden to prove that consent is voluntary if given immediately after an assertion of lawful authority to search. *Cf. Hoover v. Beto*, 467 F.2d 516, 521 (5th Cir. 1972) (deciding *Bumper* did not invalidate consent given immediately after officer said he had a warrant to search a home when the defendant, a criminal practice attorney, told officer that "his warrant was not necessary and to come on into his home and search wherever he wanted"); *Earls v. State*, 496 S.W.2d 464, 466, 468 (Tenn. 1973) (rejecting argument that *Bumper* provides "a blanket prohibition" and concluding that consent provided after presentation of warrant was voluntary when the defendant threw it to the ground and stated, "You needn't to have brought a search warrant. You gentlemen are welcome to search anywhere on my premises you want to search and take anything you find."). Regardless, the *Schneckloth* Court rejected the type of per se rule the dissent proposes. *See* 412 U.S. at 229 ("The problem of reconciling the recognized legitimacy of consent searches with the requirement that they be free from any aspect of official coercion cannot be resolved by any infallible touchstone."); *see also United States v. Drayton*, 536 U.S. 194, 207 (2002) (noting that "there are no *per se* rules" in deciding whether consent was voluntary).

**¶20**        Since *Schneckloth*, the Court's declarations in other cases involving voluntary consent to search bolster the view that a court must examine the totality of the circumstances even when officers assert a lawful authority to search. *See Drayton*, 536 U.S. at 207 ("[T]he Court has repeated that the totality of the circumstances must control" in deciding consent); *Mendenhall*, 446 U.S. at 558–59 (examining circumstances surrounding consent to decide whether the district court properly found consent voluntary rather than coerced). Other courts have also supported this view. *See, e.g.*, *United States v. Juarez*, 573 F.2d 267, 273–74 (5th Cir. 1978) (noting *Bumper* and *Schneckloth*, then examining the totality of circumstances to conclude that defendant gave voluntary consent by saying, "[t]hat's fine" after officer said "Well, I am going to have to search you"); *Byars v. State*, 533 S.W.2d 175, 180 (Ark. 1976) ("[W]e do not take *Bumper* to mean that an accused can never be deemed to have consented to a search, if a search warrant had been obtained and the accused was aware of that fact. Rather, we consider that this question is determined by the particular facts present when the consent is purportedly given."). This Court has likewise focused on the totality of the circumstances, including but not limited to an officer's reading of an admin per se form, in determining whether a DUI suspect's

consent to search was freely and voluntarily given. *See Butler*, 232 Ariz. at 88–89, ¶¶ 19–20, 302 P.3d at 613–14.

¶21 For these reasons, we hold that a trial court should examine the totality of the circumstances to decide whether consent was voluntary, even when given after a law enforcement officer's assertion of lawful authority to search. We neither decide whether the court should apply an objective or subjective standard to resolve this issue nor identify whose perspective—the search subject's, the officer's, or a hypothetical third party's— from which to view the voluntariness of consent. The parties did not brief these issues, and the Supreme Court's Fourth Amendment jurisprudence after *Schneckloth* has cast doubt on pinpointing the correct approach. *Cf.* Megan Annitto, *Consent Searches of Minors*, 38 N.Y.U. Rev. L. & Soc. Change 1, 8–9 (2014) (describing shift in the Supreme Court from examining subjective factors to instead considering whether an officer reasonably believed that consent was voluntary); Blanca L. Hernández, *Incapacity to Refuse Consent: Fourth Amendment Offenses in Consensual Searches of Individuals with Mental Illness*, 23 S. Cal. Rev. L. & Soc. Just. 387, 399–400 (Spring 2014) (noting that the *Drayton* Court strayed from *Schneckloth*'s assessment of the consenter's personal perspective and mental state in favor of examining the conduct of law enforcement); Nancy Leong & Kira Suyeishi, *Consent Forms and Consent Formalism*, 2013 Wis. L. Rev. 751, 760–61 (2013) ("Following *Mendenhall*, the Supreme Court suggested in a number of cases that the court should determine whether an officer's actions were reasonable from an objective standpoint, rather than a subjective one . . . . The Court has not, however, explicitly overruled *Schneckloth*, leaving doubt regarding the extent to which consent searches should take subjective factors into account."). In any event, we would reach the same conclusion here regardless of which approach is followed.

¶22 Based on our review of the suppression hearing evidence, we conclude that the State failed to prove by a preponderance of the evidence that Valenzuela's consent was voluntary. *Bumper* and *Johnson* direct this outcome. By telling Valenzuela multiple times that Arizona law required him to submit to and complete testing to determine AC or drug content, the officer invoked lawful authority and effectively proclaimed that Valenzuela had no right to resist the search. *See Bumper*, 391 U.S. at 549; *Johnson*, 333 U.S. at 13–15. At the time of these repeated admonitions, Valenzuela had been arrested and taken to a police station. Nothing in the record suggests that the officer retracted the assertion of lawful authority to conduct a

warrantless search or that other circumstances existed to dispel the coerciveness of the admonitions before Valenzuela granted consent.

**¶23** Our society expects, and unquestionably demands, that people follow directives issued by law enforcement officers. *Cf. Bumper*, 391 U.S. at 549 n.14 (noting that acquiescence to a warrant demonstrates "an intention to abide by the law" and "show[s] a regard for the supremacy of the law"); *see also* Tom R. Tyler & John M. Darley, *Building a Law-Abiding Society: Taking Public Views About Morality and the Legitimacy of Legal Authorities into Account When Formulating Substantive Law*, 28 Hofstra L. Rev. 707, 716 (2000) ("Citizens regard it as appropriate for police officers to direct citizen behavior, and they follow these directives without requiring explanation or justification."). That is what Valenzuela did here. Consequently, Valenzuela's "consent," like the grandmother's consent in *Bumper*, was merely an acquiescence to a claim of lawful authority.

**¶24** The State argues that *Bumper* is distinguishable because the officer there effectively told the grandmother she had no right to resist the search by claiming to have a warrant, while the DPS officer here correctly informed Valenzuela that Arizona law required him to submit to testing or his license would be suspended. The implied consent law, however, nowhere "requires" a DUI arrestee to submit to testing, and the DPS officer's admonition therefore did not mirror the statute. *See* A.R.S. § 28-1321(A), (B) (stating that although a DUI arrestee "gives consent" to testing of blood, breath, or other bodily substance, he "shall be *requested* to submit to and successfully complete" any such test) (emphasis added). But even assuming that the officer accurately paraphrased the law, this distinction is immaterial. The *Bumper* Court's ruling turned on the grandmother's acquiescence to the officer's assertion of lawful authority to search regardless of the truthfulness of the officer's claim to possess a warrant. *See Bumper*, 391 U.S. at 548–49 (holding that the prosecutor's burden to prove that consent was voluntarily given "cannot be discharged by showing no more than acquiescence to a claim of lawful authority"). The officer's claim of authority to search was "instinct with coercion" whether or not he actually possessed a valid warrant. *See. id.* at 549 ("A search conducted in reliance upon a warrant cannot later be justified on the basis of consent if it turns out that the warrant was invalid."); *see also Lo-Ji Sales*, 442 U.S. at 329 (citing *Bumper* and holding that after a business's agent was arrested and made aware of "the presumed authority" of a search warrant, his compliance with officers' requests could not be considered free and

voluntary consent to a search); *State v. Medicine*, 865 N.W.2d 492, 498 ¶ 13 (S.D. 2015) (holding that *Bumper* applies whether an officer honestly represents authority or fabricates it). Consequently, whether the officer here correctly recited Arizona's implied consent law is immaterial.

¶25 The State also argues that *Bumper* is inapplicable because, regardless of the DPS officer's admonitions in this case, Valenzuela consented to the search pursuant to § 28-1321(A) by operating a vehicle within the state. Although § 28-1321 validly provides an arrestee's consent to civil penalties for refusing or failing to complete requested tests, we have rejected the contention that the implied consent law operates to prospectively provide consent to a search for Fourth Amendment purposes. *See Butler*, 232 Ariz. at 88 ¶ 18, 302 P.3d at 613 ("[I]ndependent of § 28-1321, the Fourth Amendment requires an arrestee's consent to be voluntary to justify a warrantless blood draw."); *Carrillo*, 224 Ariz. at 463 ¶ 1, 232 P.3d at 1245 (interpreting § 28-1321 to require either an arrestee's express consent or a warrant before an officer can administer a test). According to the State, however, the United States Supreme Court suggested in *McNeely* that implied consent laws validly require arrestees to submit to blood draws and are sufficient to satisfy the consent exception to the warrant requirement, unless the arrestee withdraws consent.

¶26 The State misreads *McNeely*. The issue there was whether the dissipation rate of alcohol in the bloodstream constitutes an exigency that justifies warrantless searches in all drunk-driving cases. 133 S. Ct. at 1556. The Court rejected a per se exigency exception and held that "[w]hether a warrantless blood test of a drunk-driving suspect is reasonable must be determined case by case based on the totality of the circumstances." *Id.* at 1563. In responding to Missouri's argument that requiring a warrant to draw blood would undermine efforts to combat drunk-driving, the Court pointed out that states "have a broad range of legal tools to . . . secure [AC] evidence without undertaking warrantless nonconsensual blood draws." *Id.* at 1566 (plurality opinion). As one example, the Court noted that all states "have adopted implied consent laws that require motorists . . . to consent to [AC] testing if they are arrested," and such laws impose significant consequences, such as license suspension, when an arrestee withdraws consent. *Id.* The Court did not suggest, however, that implied consent laws supply an arrestee's constitutionally valid consent to a warrantless search. From the context of the discussion, we read the Court's reference to implied consent laws as meaning that these laws likely

convince many drivers to give consent rather than suffer the statutory consequences for not doing so, thereby sparing law enforcement the need to secure a warrant. *See id.*

**¶27**     The court of appeals majority distinguished *Bumper* because, unlike the grandmother there, Valenzuela supposedly knew he could refuse consent. *Valenzuela*, 237 Ariz. at 311 ¶ 13, 350 P.3d at 815. It reasoned that § 28-1321 permits a driver to refuse a warrantless search, and the DPS officer here gave Valenzuela that choice by informing him that a refusal would result in a civil penalty and prompt the officer to seek a warrant to compel testing. *Id.* We disagree. The officer's testimony is unclear whether he provided this information to Valenzuela. But even if he did so, he effectively asked Valenzuela to either follow Arizona law (submit to testing) or violate Arizona law (refuse to submit to testing). That Valenzuela might have been informed of the consequences for refusal does not alter the fact that the officer coerced Valenzuela's consent by repeatedly telling him that Arizona law "required" him to submit to testing, implying that he had no legal right to refuse.

**¶28**     We do not hold today that § 28-1321 violates the Fourth Amendment or that officers must cease advising arrestees about the law's requirements and the civil consequences for refusal.[2]  *See Campbell v. Superior Court*, 106 Ariz. 542, 554, 479 P.2d 685, 697 (1971) (finding "no merit" to the argument that Arizona's implied consent law violates the Fourth Amendment). But officers must inform arrestees in a way that does not coerce consent by stating or implying that officers have lawful authority, without a warrant, to compel samples of blood, breath, or other bodily substances.

**¶29**     A law enforcement officer can invoke the implied consent law without infringing on an arrestee's Fourth Amendment rights by following the procedure set forth in § 28-1321(B). After making a DUI arrest, the officer should ask whether the arrestee will consent to provide samples of blood, breath, or other bodily substances for testing. If the arrestee expressly agrees and successfully completes testing, the officer need not

---

[2] The Supreme Court is currently considering whether, in the absence of a warrant, a state may criminalize a person's refusal to submit to a test to detect a person's AC. *See Bernard v. Minnesota*, 136 S. Ct. 615 (2015); *Birchfield v. North Dakota*, 136 S. Ct. 614 (2015).

advise the arrestee of the statutory consequences for refusing consent. The officer must, however, advise the arrestee before testing that the outcome of the tests may result in the penalties set forth in § 28-1321(B)(1) and (2). If the arrestee refuses to consent to testing or fails to successfully complete the tests, the officer should advise the arrestee of the consequences for refusal or incomplete testing as provided in § 28-1321(B), and then ask again whether the arrestee will consent to testing. Although this choice "will not be an easy or pleasant one for a suspect to make," this difficulty does not make the decision coerced. *South Dakota v. Neville*, 459 U.S. 553, 564 (1983) (considering Fifth Amendment challenge to admission in evidence of refusal given in response to implied consent admonition). If the arrestee again refuses to agree to testing or fails to successfully complete testing, a test must not be given unless the officer secures a search warrant, except that the officer may validly obtain a sample of blood or other bodily substances taken for medical purposes, A.R.S. §§ 28-1321(D)(1), -1388(E). Alternatively, the state might revise its implied consent admin per se form to mirror one used in South Dakota, which provides the arrestee with a clear choice whether to submit to testing or refuse consent. *See Neville*, 459 U.S. at 555 n.2.

**¶30**     In sum, we hold that the State failed to carry its burden to show by a preponderance of the evidence that Valenzuela freely and voluntarily consented to providing samples of his blood and breath. By advising Valenzuela after he was arrested and detained that Arizona law required him to submit to testing, the officer invoked lawful authority to compel consent. Because nothing in the suppression hearing record dispels the coercive implication of the officer's repeated admonition, the trial court erred by finding that Valenzuela had voluntarily consented to the search and then denying the motion to suppress the test results on that basis. *Cf. Medicine*, 865 N.W.2d at 500 ¶ 17 (holding consent to blood draw involuntary when, among other circumstances, it was given after officer informed arrestee that South Dakota law provides that drivers automatically consent to blood draws).

### C.     Good-faith exception to the exclusionary rule

**¶31**     The State alternatively argues, as it did at the suppression hearing, that the good-faith exception to the exclusionary rule applies, and the trial court therefore properly denied the motion to suppress. The exclusionary rule, which allows suppression of evidence obtained in

violation of the Fourth Amendment, is a prudential doctrine invoked to deter future violations. *Davis v. United States*, 564 U.S. 229, 131 S. Ct. 2419, 2426 (2011). "Exclusion is 'not a personal constitutional right,' nor is it designed to 'redress the injury' occasioned by an unconstitutional search." *Id.* (citation omitted). Therefore, when law enforcement officers "act with an objectively reasonable good-faith belief that their conduct is lawful," deterrence is unnecessary and the exclusionary rule does not apply. *Id.* at 2427–28 (internal quotation marks and citation omitted); *see also* A.R.S. § 13-3925 (codifying good-faith exception to the exclusionary rule).

¶32 The good-faith exception applies here. Well before the DPS officer advised Valenzuela from the admin per se form, this Court characterized Arizona's implied consent law as "requir[ing] a person to submit to a chemical test of his blood, [breath] or urine if arrested for [DUI] or face a . . . suspension of his driver's license." *Campbell*, 106 Ariz. at 546, 479 P.2d at 689. In *State v. Brito*, 183 Ariz. 535, 538–39, 905 P.2d 544, 547–48 (App. 1995), the court of appeals rejected an argument that the same admin per se form read to Valenzuela incorrectly advised that Arizona law *requires* submission to testing before asking for consent. The court concluded that the admonition's language conformed to our decision in *Campbell* and "does not misstate the law," and that "a licensed driver does not have an unfettered right to refuse to take a blood alcohol test or breath test upon the request of a law enforcement officer"). *See also* Jefferson Lankford, *Arizona DUI: A Manual for Police, Lawyers, and Judges* 66, 133 (2001-2002 ed.) (stating that "[t]he driver has the power but not the right to refuse testing under the implied consent law" and including an "admin per se" form with language identical to that used by the DPS officer here). Pursuant to a then-existing statutory mandate, the court in *Brito* also reviewed the record for fundamental error, which would have encompassed the court's complete case review for any prejudicial Fourth Amendment violations resulting from use of the admonition, but found none. 183 Ariz. at 539, 905 P.2d at 548.

¶33 We today hold that consent given solely in acquiescence to the admonition used here and in *Brito* is not free and voluntary under the Fourth Amendment and cannot excuse the failure to secure a warrant. But at the time of events here, the DPS officer followed binding precedent that had sanctioned use of the admonition read to Valenzuela, and the good-faith exception therefore applies. *Cf. Davis*, 131 S. Ct. at 2429 ("An officer who conducts a search in reliance on binding appellate precedent does no

more than 'ac[t] as a reasonable officer would and should act' under the circumstances. . . . The deterrent effect of exclusion in such a case can only be to discourage the officer from 'do[ing] his duty.'") (internal quotation marks and citations omitted).

¶34        The dissent contends that use of the admin per se form reflects "recurring or systemic negligence" by law enforcement because this Court in *Carrillo* "expressly reject[ed] *Brito's* assertion that Arizona's implied consent statute requires suspects to submit to testing." *See infra* ¶ 57. But *Carrillo* did not address whether the implied consent statute "requires" submission to testing as stated in *Campbell* and *Brito*. Instead, *Carrillo* held that, as a matter of statutory interpretation, the implied consent statute requires that an arrestee "unequivocally manifest assent to the testing by words or conduct" before officers can conduct warrantless testing. 224 Ariz. at 466 ¶ 19, 232 P.3d at 1249. We neither suggested that the admonition used here to obtain that assent misstated the law or was coercive, nor has this Court ever questioned or overruled *Campbell* or *Brito*. Indeed, because the officer in *Carrillo* had not advised the defendant of the implied consent law, the lawfulness of an admonition was not at issue. *See* 224 Ariz. at 463 ¶¶ 3–4, 232 P.3d at 1245. The dissent faults law enforcement for failing to anticipate that we would disapprove the admin per se form in the wake of *Carrillo*, but we are hard-pressed to do so when *Carrillo* is not dispositive of the issue raised here, and our courts have continued to approve the admonition. *See State v. Oliver*, No. 2 CA-CR 2014-0359 ¶¶ 23–25 (Ariz. App. Aug. 18, 2015) (mem.) (following *Brito* to reject defendant's argument that the given admonitions, which mirrored ones given to Valenzuela, misstated the implied consent statute); *Valenzuela*, 237 Ariz. at 313 ¶ 24, 350 P.3d at 817 ("[I]t is not a per se violation of the Fourth Amendment if the officer phrases the admonition as a requirement.").

¶35        In short, the DPS officer here did not "deliberately, recklessly, or with gross negligence" conduct the search in violation of the Fourth Amendment, but instead acted with "an objectively reasonable good-faith belief" that the admonition was lawful. *Davis,* 131 S. Ct. at 2427–28 (internal quotation marks omitted). Suppression of Valenzuela's test results would not serve the exclusionary rule's purposes. *Cf. Herring v. United States*, 555 U.S. 135, 144 (2009) ("To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system."). For these reasons, the good-faith exception to the

exclusionary rule applies. The trial court therefore properly denied the motion to suppress, albeit for a different reason. *Cf. State v. Roseberry*, 237 Ariz. 507, 508 ¶ 7, 353 P.3d 847, 848 (2015) ("We will affirm a trial court's decision if it is legally correct for any reason.").

## III. CONCLUSION

**¶36** We vacate the court of appeals' opinion and affirm Valenzuela's convictions and resulting sentences.

Bales, C.J., concurring in part and dissenting in part.

¶37         I agree that Valenzuela did not voluntarily consent to the warrantless search, and I therefore specially concur in parts I, II.A, and II.B of the majority opinion.  In two respects, however, I disagree with the majority's analysis.  First, I would hold that a person cannot, as a matter of law, be deemed to have voluntarily consented by acquiescing when police assert a search is lawfully authorized (or, as the police stated here, "required" by law).  Second, I would not address, in the first instance, the application of the good-faith exception to the exclusionary rule, but if I had to reach the merits, I would hold that the exception does not apply. Accordingly, I respectfully dissent from parts II.C and III.

**I.**

¶38         Consistent with *Schneckloth*, the majority recognizes that the voluntariness of consent to a search is determined by the "totality of the circumstances."  *Supra* ¶ 11.  In most cases, this inquiry is a factual determination that considers various aspects of the setting in which a search occurs, the conduct of law enforcement officers, and the characteristics of the person who submits to the search. *See Schneckloth*, 412 U.S. at 226–27, 229; *Butler*, 232 Ariz. at 87–88, ¶¶ 13, 20, 302 P.3d at 612-13.

¶39         "Where there is coercion there cannot be consent."  *Bumper*, 391 U.S. at 550.  *Bumper* and earlier Supreme Court decisions recognize that an assertion of lawful authority is inherently (although perhaps lawfully) coercive.  Thus, if submission to a search is immediately preceded by such an assertion, consent cannot be deemed voluntary.  *See id.*   More colloquially, these cases stand for the principle that people do not "voluntarily" consent to searches when they do what the police say the law requires them to do.   This "lawful authority principle" is not displaced by *Schneckloth*.

¶40         The lawful authority principle is clearly illustrated by *Bumper*, where the Court held that a homeowner's consent was involuntary solely because it was immediately preceded by an officer's assertion that he had a warrant.  *Id.* at 548–49.  *Bumper* gave no weight to other circumstances of the search.  The homeowner was never placed in custody or threatened; she told the officers to "go ahead and look all over the house." *Id.* at 556 (Black,

J., dissenting). She testified that she "had no objection to [the police] making a search," she allowed the search "entirely under her own free will," and she was not forced "at all." *Id.*

¶41 Despite the circumstances suggesting the homeowner was not pressured to submit, the Court in *Bumper* treated as dispositive the fact that the search was immediately preceded by an assertion of lawful authority by the police. Because such an assertion is inherently coercive, *id.* at 550, any succeeding "consent" cannot be "freely and voluntarily given." *Id.* at 548–49. The Court effectively held that consent, in these circumstances, cannot, as a matter of law, be deemed voluntary.

¶42 *Bumper* comports with prior Supreme Court decisions. In *Johnson v. United States*, 333 U.S. 10 (1948), the police, having traced the smell of burning opium to a hotel room, gained entry by knocking on the door, identifying themselves, and telling the occupant that they "want[ed] to talk to [her] a little bit." *Id.* at 12. The occupant stepped back "acquiescently" and admitted the officers. *Id.* Rejecting any suggestion that the occupant had consented to the entry, the Court observed that it "was demanded under color of office" and "granted in submission to authority." *Id.* at 13. In ruling the entry was nonconsensual, the Court did not consider other circumstances of the search.

¶43 *Johnson* in turn cited *Amos v. United States*, 255 U.S. 313 (1921), where officers went to a home seeking evidence of illegally distilled whiskey. *Id.* at 315. The officers gained entry by telling the suspect's wife that they were "revenue officers that had come to search the premises 'for violations of the revenue law.'" *Id.* Without otherwise assessing the circumstances, the Court noted that any contention that the search had been consensual "cannot be entertained," because the officers had demanded admission "to make a search . . . under government authority." *Id.* at 317. Foreshadowing *Bumper*, the Court noted that "it is perfectly clear that under the implied coercion here presented," the wife could not voluntarily consent to the search (which the Court phrased as waiving the husband's constitutional rights). *Id.*

¶44 We should read *Schneckloth* as preserving the lawful authority principle. Most significantly, the principle respects Fourth Amendment values by recognizing that we expect people to comply with police

19

assertions of lawful authority and that acquiescence in such assertions should not be viewed as "freely and voluntarily" given consent.

¶45        *Schneckloth,* moreover, quoted *Bumper*'s reasoning approvingly and otherwise indicates the Court did not intend to displace its earlier case law.  Citing *Bumper*, *Johnson*, and *Amos*, the Court noted "if under all the circumstances it has appeared that the consent was not given voluntarily—that it was coerced by threats or force, or granted only in submission to a claim of lawful authority—then we have found the consent invalid and the search unreasonable."  412 U.S. at 233–34.  This statement should not be read as modifying the Court's prior decisions, but instead as recognizing that the lawful authority principle complements the "totality of the circumstances" test.  Immediately after making this statement, *Schneckloth* explained that the Court had not found valid consent in *Bumper,* noting that "(w)hen a law enforcement officer claims authority to search a home under a warrant, he announces in effect that the occupant has no right to resist the search.  The situation is instinct with coercion—albeit colorably lawful coercion.  Where there is coercion there cannot be consent."  *Id.* at 234 (quoting *Bumper*, 391 U.S. at 550).

¶46        *Schneckloth* did not itself involve an assertion of lawful authority to conduct a search, but instead whether the prosecution must show that a person knew he or she had a right to refuse in order to establish that consent was voluntarily given.  412 U.S. at 223-24.  In holding that such knowledge is not a prerequisite, *Schneckloth* noted that this factor was not considered in *Bumper*, *Johnson*, or *Amos*.  *Id.* at 234.  But recognizing that these decisions did not require the prosecution to show a person subjectively knew they could refuse to submit, or that voluntariness depends on the "totality of the circumstances," is not inconsistent with the lawful authority principle.  *See id.* at 243 n.31 (noting that *Johnson* and *Amos* turned on objective circumstances of search rather than absence of knowledge of right to refuse).

¶47        Indeed, *Schneckloth* itself noted "Our decision today is a narrow one.  We hold only that when the subject of a search is not in custody and the State attempts to justify a search on the basis of his consent, the Fourth and Fourteenth Amendments require that it demonstrate that the consent was in fact voluntarily given, and not the result of duress or coercion, express or implied."  412 U.S. at 248.  Although "[v]oluntariness

is a question of fact to be determined from all the circumstances," *id.* at 248–49, the Court in *Schneckloth* also restated its earlier observation in *Bumper* that assertions of lawful authority are inherently coercive. The best way to reconcile the Supreme Court's statements is to recognize that consent to a search cannot, as a matter of law, be deemed voluntary when it is immediately preceded by an assertion of lawful authority.

¶48 In rejecting this proposition, the majority identifies two hypotheticals. *Supra* ¶ 18. The first is when an officer retracts an assertion of lawful authority before a person accedes to a search. This hypothetical does not argue against the lawful authority principle. The principle rests on the inherent coerciveness of the assertion of lawful authority; it does not apply when the assertion is withdrawn before a person assents to a search.

¶49 The second hypothetical – where an officer's assertion of authority is contradicted by a private third-party before the person submits to a search – also does not support rejecting the lawful authority principle. One might conclude that the inherently coercive nature of the officer's assertion cannot be dispelled by unofficial, third-party statements. To hold otherwise would require finding that a person can completely ignore the officer's claimed authority and "freely" submit after a third party tells them they need not do so. None of the cases cited by the majority, *supra* ¶ 18, involve a third party contradicting an officer's assertion of authority. Nor need we address that issue here: the officer's assertion immediately preceded Valenzuela's assent to the search.

¶50 The majority also implicitly recognizes that the *Schneckloth* "totality test" must apply differently when, as is true here, an officer has asserted lawful authority to conduct a search. The majority – like the Supreme Court in *Bumper* and *Johnson* – does not find significant various circumstances that generally apply under a "totality" test, but instead gives dispositive weight to the officer's repeated assertions of lawful authority. *Compare* ¶¶ 22–23 (concluding that Valenzuela's "consent," like the grandmother's consent in *Bumper*, was involuntary because nothing dispelled the coercive nature of the assertion of authority) *with Valenzuela,* 237 Ariz. at 315 ¶¶ 30-31, 350 P.3d at 819 (noting that various factors, including suspect's demeanor, emotional state, education, and intelligence, should be considered); *cf Schneckloth*, 412 U.S. at 227, 249 (noting that

suspect's knowledge of right to refuse generally is a factor to be considered).

¶51 A better path to the majority's conclusion would be holding that consent cannot, as a matter of law, be deemed voluntary when it is immediately preceded by a claim of lawful authority. Reaffirming this lawful authority principle would remain faithful to Supreme Court precedent while protecting Fourth Amendment values and providing clearer guidance for the public, law enforcement, and our courts.

## II.

¶52 The majority, recognizing that Valenzuela's consent was involuntary, goes on to hold that the evidence obtained from the unlawful search is admissible under the good-faith exception to the exclusionary rule. ¶¶ 30–32. The good-faith exception was not addressed by the trial court or the court of appeals.

¶53 Application of the good-faith exception can involve complicated considerations of the social costs and deterrent benefits from excluding the evidence at issue. *See, e.g., Herring v. United States*, 555 U.S. 135, 141 (2009) (discussing whether to apply the good-faith exception to the exclusionary rule requires analyzing the benefits of deterrence against the social costs of excluding evidence in any particular case). The parties did not discuss the exception in their briefs – indeed, the State merely afforded the exception a passing mention in a footnote. Given the lack of briefing, I would decline to address the good-faith exception and instead remand to the trial court to consider, in the first instance, whether the issue has been preserved and, if so, how it should be resolved.

¶54 On the merits, I disagree with the majority's analysis. *Davis* states that when law enforcement officers "act with an objectively reasonable good-faith belief that their conduct is lawful," deterrence is unnecessary and the exclusionary rule does not apply. 131 S. Ct. at 2427–28. But the rule serves an important deterrence purpose when there is either deliberate, reckless, or grossly negligent conduct or "recurring or systemic negligence." *Davis*, 131 S. Ct. at 2428 (citing *Herring*, 555 U.S. at 144).

**¶55**      In this case, the officer's use of an MVD admin per se form inaccurately telling people that they are required to submit to tests reflects at least "recurring or systemic negligence." *Id.* In applying the good-faith exception to the exclusionary rule, courts expect that "[r]esponsible law-enforcement officers will take care to learn what is required of them" under binding precedent and "conform their conduct to these rules." *Id.* at 2429 (internal quotation marks and citations omitted).

**¶56**      More than five years ago, in *Carrillo v. Houser*, 224 Ariz. 463, 232 P.3d 1245 (2010), this Court considered whether Arizona's implied consent statute, A.R.S. § 28-1321 – the same statute at issue today – authorizes law enforcement officers to administer warrantless tests without a person's express consent. 224 Ariz. at 463 ¶ 1, 232 P.3d at 1245. Recognizing that the underlying statutes allow people to refuse to submit to testing, *id.* at 465 ¶ 11, 232 P.3d at 1247, we held that an officer must obtain a warrant or express consent in order to administer a test. *Id.* at 466 ¶¶ 18, 19, 232 P.3d at 1248.

**¶57**      *Carrillo* establishes that police officers were misstating the law when they admonished arrestees, based on the MVD form, that they are required to submit to tests. The misstatement does not occur just once. The form states that "Arizona law requires you to submit" to a warrantless test, and repeats that "requirement" under Arizona law no fewer than three more times. To underscore the point, the form concludes by stating "You are, therefore, required to submit to the specified tests." *Carrillo* was decided in 2010. Insofar as law enforcement officers have continued to coercively admonish DUI suspects that "Arizona law requires" submission to warrantless tests, they have ignored this Court's binding precedent.

**¶58**      Given *Carrillo*, I cannot accept the majority's conclusions that "binding precedent" sanctioned the admonition given to Valenzuela and "the good-faith exception therefore applies." *Supra* ¶ 33. As a decision by this Court, *Carrillo* is the binding authority regarding the meaning of the implied consent statute, and its legal force does not depend on our expressly singling out inconsistent lower court decisions or administrative practices. The majority's reliance on *State v. Brito*, 183 Ariz. 535, 539, 905 P.2d 544, 548 (App. 1995), is particularly misplaced, given that *Carrillo* expressly rejects *Brito*'s assertion that Arizona's implied consent statute requires suspects to submit to testing. *Cf. Carrillo*, 224 Ariz. at 466 ¶ 18, 232

P.3d at 1248 (noting that "the statute has always provided that an arrestee may refuse to submit to tests but that doing so will result in the loss of the arrestee's license"). At the least, after *Carrillo* the admonition was of dubious legality, and *Davis* should not apply.

¶**59** Extending *Davis* to apply the good-faith exception when the law is unsettled *incentivizes*, rather than deters, unconstitutional behavior. *See Davis*, 131 S. Ct. at 2435 (Sotomayor, J., concurring). "Official awareness of the dubious constitutionality of a practice would be counterbalanced by official certainty that, so long as the Fourth Amendment law in the area remained unsettled, evidence obtained through the questionable practice" would not be excluded. *Id.* (internal quotation marks and citations omitted). *Cf.* Emily Ward, Note, *From Pen to Patrol: How Arizona Law Enforcement Applied Carrillo v. Houser*, 53 Ariz. L. Rev. 345 (2011) (discussing initial responses by law enforcement to *Carrillo*).

¶**60** Here, the police incorrectly told drivers that they were lawfully required to submit to tests, even though our 2010 decision in *Carrillo* recognized that "the statute has always provided that any arrestee may refuse to submit." 224 Ariz. at 466 ¶ 18, 232 P.3d at 1248. Applying the good-faith exception here effectively rewards the systemic failure to revise the MVD admonition to accurately state the law. That result conflicts with the reasoning of *Davis* and the goals of the exclusionary rule. Thus, I respectfully dissent from parts II.C and III of the majority opinion.